# Fenwick's Administrator *vs* Macey.

## Error to the Franklin Circuit.

*Lis pendens.    Mortgagor and mortgagee.    Privity.*

Chief Justice Robertson delivered the Opinion of the Court.

On the 4th of March, 1839, *John A. Holton,* as administrator of *William Fenwick,* deceased, brought an action of *detinue* against *Leander W. Macey,* for several slaves purchased and held for more than five years by *Macey,* under a decree for foreclosure and sale, which had been obtained by the Bank of Kentucky against *Alexander Macey,* in the year 1830, on a bill filed by the Bank against the said *Alexander,* as mortgagor of the said slaves, by a deed alledged to have been executed in February, 1822.

The administrator relied on the record of a suit in chancery instituted by his intestate in *June,* 1822, against the said *Alexander Macey,* for redeeming the said slaves and others, upon an allegation that the said intestate had, in the year 1807, mortgaged them to the said *Alexander;* and in which suit—neither the Bank of Kentucky nor the said *Leander W. Macey* being a party—this Court, at its spring term, 1833, established the right to redeem, as claimed in the bill, and the Circuit Court, in the year 1835, rendered a final decree for unconditional restitution of the slaves by *Macey's* executors to *Fenwick's* administrator.

The parties submitted the case to the Circuit Judge, to be decided without a jury, and agreed that he might consider as evidence before him, so much only of the record of the suit by the Bank against *A. Macey,* dec'd. and of the record in the suit by *W. Fenwick,* dec'd. against the *same,* as would have been legally admissible though specially objected to as competent.

A judgment having been rendered in bar of the action, we shall consider only one question in revising it, and that is, whether upon the legal evidence submitted to the Judge below, he ought to have considered *L. W.*

*Margin notes:*

Detinue.

Case 148.

Oct. 28, 1841.

The case stated.

The ground assumed for a recovery.

The question presented for decision.

FENWICK'S AD'R.
vs
MACEY.

*Macey* as a *pendente lite* purchaser, and, therefore, concluded by the decree in the case of "*Fenwick* vs *Macey*," for, unless he should be deemed to have been such a purchaser, his possession was, in law, as well as in fact, adverse to *Fenwick's* title for more than five years preceeding the commencement of this action, and he is thereby protected, even though his derivative title, as acquired through the Bank of Kentucky, might be superior to that of Fenwick as original mortgagor.

The purchaser under a decree foreclosing a mortgage, occupies the attitude of the mortgagee and acquires his title, and is not affected by the pendency of a suit to which the mortgagee is not a party.

Having acquired the title of the Bank, *L. W. Macey* may not be affected by the decree against *A. Macey*, dec'd. otherwise than the Bank itself was affected by it, for if, as mortgagor, *ante litem*, the Bank had a right to sell the slaves notwithstanding the subsequent *lis pendens* and unaffected by it, surely any stranger had an equal right to buy and hold all the title thus sold as effectually as he might have done had the sale been prior to the commencement of the suit of *W. Fenwick* vs *A. Macey*. And if, as alledged, the Bank held a *forfeited unsatisfied* mortgage, executed in *good faith*, antecedently to the pendency of that suit, it was not, in any available sense, a purchaser *pendente lite*, and had a right to enforce its mortgage and pass its legal title unaffected by the *lis pendens*, succeeding the date of its mortgage.

The doctrine of *lis pendens* applies to parties only, and those deriving title through them after the *lis pendens*.

The doctrine that any stranger who, during the pendency of a suit for property, acquires a claim to that property or any portion of it, from the unsuccessful party to the suit, shall be concluded by the judgment or decree rendered therein, against that party, is founded on policy or rather necessity, otherwise litigation might be interminable and unavailing. The principle of the doctrine is well defined and cannot be expanded so as to embrace a stranger whose right existed when no suit was pending. A suit for property concludes only the parties thereto, and all persons deriving title from the unsuccessful party during a diligent prosecution of the suit. And a person, who is neither a party nor privy, and who, as between himself and the party in possession of the subject of litigation, has the right of property and possession neither derived from either of the parties nor acquired since the *lis pendens* between them, may certainly take the posses-

sion, during the pendency of the suit, without subjecting himself to any of the consequences of a purchase or intrusion *pendente lite.* The principle of the anomalous doctrine of *lis pendens,* is totally and obviously inapplicable to such a case, and has never, so far as we know, been misapplied to such an one by any Court of Justice in the world. And this much had been virtually decided by this Court in the case between the present parties, reported in 9 *Dana,* 198.

But the facts in that case were hypothetical, and have not, in our opinion, been sufficiently established in this case.

The record of the case of the *Bank* vs *Macey* was not legal evidence against *Fenwick's* administrator, of the title of the Bank. No other evidence of that title was offered in the Court below. There was then, according to the agreed case, no legal proof of even the date of the alledged mortgage to the Bank; because a copy of a copy was not admissible, and the record exhibited only a copy, cirtified by the Circuit Court clerk, of another copy which had been certified by the clerk of the County Court. This cannot, in any allowable or consistent view of it, be better or more credible than a copy taken and certified by the recording clerk, from another copy which he had taken from the original in his office. The law does not go one step further than a copy from the original; because, going beyond that limit, would increase the chances of error to an extent deemed unnecessary and perilous.

As, therefore, it does not judicially appear in this case, that the Bank was a purchaser, nor that its title accrued before the institution of *Fenwick's* suit against *Macey,* the defendant in error has failed to show that he should not be treated as a *purchaser, pendente lite,* as he certainly must be if the Bank itself was such a purchaser. For if the Bank obtained its mortgage from *A. Macey,* the unsuccessful party, since the commencement of Fenwick's suit against said *Macey,* the derivative purchaser can be in no other or better condition than the Bank itself would have been in had it made no sale.

*Margin notes:*

FENWICK'S AD'R.
*vs*
MACEY.

The record of a suit and any fact appearing therein, is not evidence against one not a party thereto—

Nor is a copy from an official copy competent evidence.

FENWICK'S AD'R.
*vs*
MACEY.

Claiming, therefore, as a purchaser under a mortgage to the Bank, and having made the purchase whilst the suit of *Fenwick* vs *A. Macey* was pending, the defendant in error must, *prima facie,* be deemed a purchaser *pendente lite,* subject to the decree rendered in Fenwick's favor, unless he had shown that the Bank had a title acquired before the commencement of that suit.

It seems to this Court, therefore, that the judgment of the Circuit Court is erroneous. But as the agreement to dispense with a jury implied, from the terms and manner of it, that the parties intended to stand, as to their ulterior rights, in all respects as they would have stood had there been a jury and verdict, and as the Circuit Judge erred in admitting incompetent evidence, we shall remand the case for a new trial, unaffected by that agreement which should now be deemed *functus officio.*

Judgment reversed and cause remanded for a re-trial.

. *Owsley and S. Todd* for plaintiff; *Crittenden and Morehead & Reed* for defendant.     ·

### PETITION FOR A RE-HEARING,
#### By Samuel Todd.

When I see the innocent punished without fault; when I see the guilty and fraudulent intruder rewarded and secured in his rapacity, I cannot but ask whether it is to be attributed to the party, the law, or the Court. No one who is acquainted with the history and facts of this cause, can hear them stated without having their moral sense of justice shocked—the mournful tale is told in 1*st Dana,* 277, how the father of these plaintiffs was completely used up, his whole substance and labor torn from him by a ferocious usurer, and when redemption was decreed, this Court truly said it would only afford "to Fenwick some retribution, though late and incomplete, for the dedication of his estate, his . service for many years." Yes, his whole estate, his whole life, for he died only three weeks after that opinion. Yes, notwithstanding the redemption is decreed to Fenwick, his right adjudged in that case, to be full and complete, five years

before this mortgage to the Bank, yet the deadly feud is descended to the son, who steps forward, clothed with fraud and intrusion, snatches away the slaves, takes them out of the possession of the defendants whilst the suit is in persevering and vigorous prosecution, *purchases the equity of redemption from the defendants,* and now this Court has declared the law to be, that the *anomalous doctrine of lis pendens* dont apply to such a case. I meet you on this occasion, with a spirit of fair and impartial inquiry after truth, both as to the facts and the law, as applicable to this case, and if you will reciprocate to me the same laudable pursuit, I believe no difference of opinion will exist; but I know the difficulty which obstruct such an inquiry, when entrammeled by previous expressed opinions, how impossible it is to divest ourselves of the prejudice and influence of previous opinions, which has been expressed and published to the world; this is my danger, and an awful one it is; but if you will but give me a fair hearing and free yourselves from that influence, I believe I can convince you that L. W. Macey is a *pendente lite* purchaser. The opinion now delivered in this case refers to the opinion reported in 9 *Dana*, 198, as the basis of the facts and the law, to govern this; it is, therefore, my design respectfully to show, that the facts in that case was overlooked, and, as I believe, erroneously stated by the Court. I will here quote the objectionable statement, it is on page 199–200, and is in these words: "Nor was L. W. Macey, as pur-"chaser, concluded by Fenwick's decree, merely on the "ground that his purchase was made between the institu-"tion of the suit and the date of the decree, because *he* "*did not derive his title from either of the parties to the* "*suit.*" Now I ask, with all candor and sincerity, whether L. W. Macey did not derive the title to the *equity of redemption from the defendants,* Morris, Dudley and Noel, the executors and trustees of Macey? If he did not purchase it from them, who did he get it from? The Bank never purchased it; the Bank, when Macey executed the mortgage; got nothing but a title as mortgagee, the equity of redemption remained in A. Macey, until his death, and then, by his will, which vested his whole estate in

Vol. II.                          60

FENWICK'S AD'R.
*vs*
MACEY.

his executors, passed to them the equity of redemption, and never was passed out of them until that very 21st day of February, 1831, when L. W. Macey became the purchaser from the defendants in that cause. I say then, without the fear of contradiction, that L. W. Macey did purchase the equity of redemption from the defendants in that suit, of Fenwich against Macey's executors, and that as to the equity of redemption he is a *purchaser pendente lite*, and bound by the decree. I know my assertions as to the law, goes for nothing; but I will here give you a case of good authority, and which I think is in point.

John Finch being the owner of messuage in Godstone, mortgaged the same to one Budgins for £100; John Finch having issue, only one daughter, being minded to keep this messuage in his own name, by his will devised the same to the plaintiff, Finch, the devisee, and about six months after John Finch died; Elizabeth, the daughter, within three days after the death of her father, married one Ditcher, and they, with one Cooper, were supposed to destroy this will. Finch, the devisee, brought his bill against Ditcher and wife, and obtained a decree to hold the land against Ditcher and wife, and all claiming under them; the devisee, Finch, then filed his bill against Newnham, the defendant, who, pending the suit to establish the will, bought in the mortgage from Budgin, and also the *equity of redemption from Ditcher and wife*. Newnham now answered, and insisted the former decree, to which *he was no party*, was unjust, but the Court declared he should be bound by the former decree, that he was *a purchaser pendente lite*: See the case of *Finch* vs *Newnham*, (2 *Vernon's Rep. page* 216.) The above case has been quoted as good law by Chancellor Kent, the Supreme Courts of New York and Virginia, and in fact is deemed a leading case.

Now it seems to me this case, like the beautiful binomial theoram, where the equations produce the same result, are identical. I will translate the names from the one into the other; here is John Finch, dec'd., there is A. Macey, dec'd, here is Budgin, there is the Bank; here is Newnham, there is L. W. Macey; here is Ditcher

and wife, there is the executors, the defendants in Fenwick's suit; here is Finch, the devisee, there is Holton, administrator of Fenwick. Now have you not overlooked this all important fact, that L. W. Macey did derive title to, and purchase *equity of redemption from the defendants in the suit of Fenwick against them?* Is it not the law then as this case decides and declares it to be? Is not L. W. Macey clearly *a pendente lite purchaser* from the defendants in the suit of the equity of redemption?

If L. W. Macey is a *pendente lite purchaser* of the equity of redemption from the defendants, does he not derive his title as to that from them. If this fact is denied now, when plainly brought to your notice, I confess I can say no more.

If L. W. Macey then is a *purchaser pendente lite,* the veil is lifted and we see plainly the title of Fenwick upon the face of the decree, declaring his title paramount to the title of the Bank, under the mortgage given by A. Macey to the Bank, declaring that Fenwick, more than five years before the date of that mortgage, had paid and double paid to Macey all the mortgage debt, due Macey from Fenwick; it is clear then, as you have declared the law to be in the case of *Breckinridge's heirs* vs *Ormsby,* (1 *J. J. Marshall,* 258,) "that it seems to result neces- "sarily, that by an extinguishment of the debt, *ipso* "*facto,* the perfect legal title relapses to the mortgagor." Yes, this great derivative title now appears in its true colors, not even sufficient in substance to make a shadow. A. Macey had nothing to convey, the Bank got nothing by the conveyance.

But I will examine the doctrine you in this opinion assert to be law, and if it is law it is also clear and certain, to my mind, that every suit for specific property may be defeated; these are your words: "a person who is "neither a party nor privy, and who, as between himself "and the party in possession of the subject of litigation, "(the defendant in the suit,) has the right of property "and possession, neither derived from either of the par- "ties (to the suit) nor acquired since the *lis pendens* be- "tween them, may certainly take the possession during "the pendency of the suit, (and defeat the decree) with-

FENWICK'S AD'R. *vs* MACEY.

''out subjecting himself to any of the consequences of a ''purchase or intrusion, *pendente lite*.'' You say further: ''The principle of the anomalous doctrine of *lis pendens,* '''is totally and obviously inapplicable to such a case, and ''has never, so far as we know, been misapplied to such ''an one by any Court of Justice in the world.'' 'And you cite your opinion in 9 *Dana,* which is the only case I can find in the world to support this opinion. With due respect, I think I can refer you to some cases where a person who was neither party nor privy to the suit, and who, as between himself and the party in possession of the subject of litigation, and who had the right of property and possession, not derived from either of the parties to the suit, nor acquired since the *lis pendens,* (but L. W. Macey did acquire his right after the *lis pendens,* and the above statement, as to him, is, I think, unfair,) and yet has been held to be an intruder and *pendente lite* purchaser, because he took the possession; the first case I allude to will be found in 13th *John. Rep. page* 447, *James Jackson* vs *Stone;* it was an action of trespass for *mesne profits.* The plaintiff, James Jackson, (who in Kentucky is John Doe,) commenced two actions of eject-ment on the demise of *Jos. Atwood* vs *Saml. and Benj. Baldwin,* in which judgments were recovered and writs of possession executed. Previous to the judgments, the defendant, Stone, (who was no party,) purchased of one Scott, who was no party, received a deed in fee, with warranty. Stone called on the Baldwins, who abandon-ed the possession of 20 acres, and he, Stone, paid them $140 for their improvements, and took possession of the 20 acres, pending the ejectment; they were all put out by writ of execution, and Stone defended this action for *mesne profits,* and on the trial, showed a perfect title. Now this is the very case you put, the identical case; here Scott had a perfect title, he was neither a party nor a privy, who, as between himself and the party in posses-sion of the subject of litigation, had the right of property and possession, neither derived from either of the parties to the suit nor acquired since the *lis pendens,* between them; he sold to Stone, who certainly took the posses-sion as L. W. Macey did, during the pendency of the

suit, from the defendants; and he was certainly held and did subject himself to all the consequences of a purchase or intrusion, *pendente lite*. In that case the Court declare that the defendant, Stone, (L. W. Macey,) as respects the title (derivative title) from Scott to the premises, stands in the same situation as the Baldwins, (the executors of Macey) from whom he took the possession, and it was upon this plain principle (I use the words of the Chancellor in the case of *Metcalfe* vs *Pulvertofft*,) that things shall be taken to remain as they were when the suit was instituted. Now if L. W. Macey had let these negroes remain where they were when the suit was instituted, the decree would have been satisfied; that very act is now, by your decision, declared to be lawful. Yes, you now say he had a right to take Fenwick's negroes from him for nothing; I say nothing, for it is not pretended that Fenwick got any thing for these negroes, nor has L. W. Macey ever paid one cent for them; you now, by this exception to the rule, which Chancellor Kent says is as well established as any rule of law whatever, which this Court, in the case of *Combs* vs *Castleman*, calls a stubborn, iron rule, absolutely necessary for the due administration of justice, but which you stigmatize by the name of anomalous; an exception which never was taken by any Judge or Court that I can find—an exception, the effect of which is to punish the innocent and reward the fraudulent rapacity of the guilty intruder. I beg you pause. It was well said by Chancellor Mannors, twice repeated by Chancellor Kent, that it was very dangerous, yes, very dangerous to fritter the rule away by exceptions. I have made a very elaborate and extensive examination, and I declare to you that I never yet have found but two exceptions to this rule, one is where the suit is prosecuted with collusion or fraud, the other is where the complainant is guilty of laches or gross negligence in prosecuting his suit; in the case of *Murry* vs *Silbum*, Chancellor Kent did say, that if the defendant "possessed cash "as the proceeds of the trust estate, or negotiable paper, "not due, or perhaps movable personal property, such as "horses, cattle, grain, &c. I am not prepared to say the "rule is to be carried so far as to affect such sales; the

"safety of commercial dealings would require a limita-
"tion of the rule, but bonds and mortgages are not the
"subject of ordinary commerce, and they formed one of
"the specific objects of the suit."

In a very important case reported in 11 *Wendall*, 442,
where Senator Seward labored with a degree of uncom-
mon assiduity to make an exception to this rule, of *pen-
dente lite nihil innovatur*, not to favor the fraudulent in-
truder, but in favor of the innocent and meritorious, fair,
and *bona fide* purchaser, who had entered into possession
previous to the commencement of the chancery suit, by
virtue of a fair and *bona fide* contract with the true and un]
disputed owner, which was made several years before the
Chancery suit was commenced, and having so previously
entered and made actual settlements, removed the forest
and built their houses, and mixed their sweat and blood
with the soil; but because they paid a part of the consid-
eration money and obtained the title *pendente lite*, this
Senator (whose good feelings as a man I admire,) labor-
ed to excuse these innocent and meritorious defendants,
by an exception, to say the least, was very doubtful, and
was contrary to the Supreme Court and was contrary to the
opinion of Chancellor Walworth, who, to my mind,
clearly proves, that the remedy was in equity; but I refer
to this case for the purpose of bringing to your notice the
important principle which ought to govern and influence
a Judge in favor of, or against adopting an exception to a
rule as well established as this rule is. Senator Seward
says, "that well established as the rule is, yet all the re-
"ported cases admits it to be harsh, and justifiable only
"on the ground that individual rights must sometimes be
"made to yield to rules established for general conven-
"ience; I may add (he says) that general and well es-
"tablished as the rule is, it is not without exceptions—
"exceptions (see page 457,) arising from the very excess
"of hardship, as applied to cases of peculiar character."
Chancellor Kent says, (1 *John. Chy. Rep.* 570,) "The
"counsel for the defendants have made loud complaints
"of the injustice of this rule, but the complaint was not
"properly addressed to me, for if it is a well settled rule,
"I am bound to apply it, and it is not in my power to

"dispense with it.   I have no doubt the rule will some-
"times operate with hardship upon a purchaser without
"actual notice, (but L. W. Macey had actual notice) but
"this seems to be one of the cases in which private mis-
"chief must yield to general convenience; and most prob-
"ably the necessity of such a hard application of the rule
"will not arise in one out of a thousand cases."   Now if
you apply the rule in this case, is not such applica-
tion in accordance with the imperious demands of jus-
tice, if however, you refuse the application of the rule
and fritter away the rule by this exception, do you not
shock the moral sense of justice, and take from the inno-
cent their just and equitable rights, and give to a fraudu-
lent intruder the whole of that remnant of that little es-
tate left these destitute orphans, as a bounty and reward
for his and his father's rapacity.

I have also called your attention to this case in 11th
*Wendall,* 456, for another purpose; it is to prove to you
that the possession alone, being taken from the defendants
pending the suit, is such an interest acquired by L. W.
Macey in the subject matter in controversy, that that act
alone makes him a purchaser *pendente lite.*

The whole stress of Senator Seward's argument was
based on the fact that, previous to the commencement of
the Chancery suit, the persons under whom the plaintiff
in error holds, had made "contracts with the true and un-
disputed owner of the premises, had entered into the pos-
session thereof, and made improvements."   He draws
the distinction between the case at bar, and that reported
in 7th *Wendall,* 152, and says in that case, an entire pur-
chase was made during the pendency of the suit in Chan-
cery; he admits that if this was the fact, the purchase
was clearly within the rule.   Was not L. W. Macey's en-
tire purchase during the pendency of the suit; did he not
take the possession during the pendency of the suit; was
not the actual possession such an interest, nay, does not
the change of the possession actually defeat the decree,
and produces all the evils the rule was made to protect.
Senator Seward quotes Senator Coldens opinion in the
case of *Hopkins, &c.* vs *McCleron,* where Colden states
the rule to be, that "if any transfer of interest, pending a

"suit, were to be allowed to affect the proceedings, there "would be no end of litigation; for as soon as a new "party was brought in, he might transfer to another, and "render it necessary to bring that other before the Court, "so that a suit might be interminable; that such, (says "Senator Seward) is the true reason of the rule, was not "questioned in the argument of this case, nor is it con- "troverted in the books, and is, therefore, here assumed." The same authority, (Seward adds, 450,) says: "This rea- "son has no application to a third person, whose interest "subsisted before the suit was commenced, and who "might have been made an original, party." Could L. W. Macey have been made an original party? Had he any interest before the 21st day of February, 1831, when he intruded himself in the cause, and purchased and took the possession from the defendants in Fenwick's suit? Was not his entire purchase and possession made during the pendency of the suit. He is the person of whom we com- plain, not the Bank of Kentucky; if the Bank has any right or title to this property, she may assert that right any way she pleases; but she has no power nor no right to assert it, sell it, or take possession of it from the de- fendants in Fenwick's suit, without making him a party and giving him a day in Court to assert and defend his rights; he had brought his suit against the persons in pos- session of the slaves; he had the right to protection by a regular and proper appeal to a sovereign Court of Justice, who had jurisdiction. "Idle would be that grant of juris- "diction, (says this Court, 1st *Litt.* 309,) which did not "confer on Courts all power necessary to effect its object; "in vain may Courts be established with power to decide "contested rights, and useless the appeal to them, if by "transferring the thing sought, the defendant could elude "the justice of the Court. The principle recognized "grew not out of any peculiar quality which chattels pos- "sess; it had its origin in more general reason, and ap- "plies universally to every description of property. It "had its foundation in the creation of tribunals of justice, and results from the necessity which all are under in a "civil community, to apply to Courts of competent juris- "diction for the redress of injuries." I contend, there-

fore, that Fenwick had a right to be protected; he had appealed and asserted his right to the specific slaves in a sovereign Court of Justice, and no third person has a right to take them out of the possession of the defendants, and defeat his decree; his rights were that things should remain in the same situation they were in when the suit was instituted.    As Chancellor Kent says: "all "persons who come in as purchasers *pendente lite*, though "they be third persons and no parties to the suit, they "and their interests (without exception) shall be bound "and avoided by the decree:" (1 *John. Chy.* 579.)    On page 580 he says: "It would be impossible, as I appre- "hend, to mention any rule of law which has been es- "tablished on higher authority or with a more uniform "sanction."    He refers to many cases, and among others the case of *Finch* vs *Newnham*, (2 *Vernon*, 216.)

I will refer you to another case which I think is fully in point against the principle you have assumed in this opinion, it will be found in the 8*th* vol. *Dana*, *p.* 78. Ray & Co. assigned some notes, and suits were prosecuted to judgments by the assignees against David Lawrence, and executions returned "no property;" the assignors paid the assignees and filed their bill against David Lawrence for a discovery of property wherewith to satisfy these judgments.    Lawrence answered and admitted that he held the equitable right to a tract of land on which he *was then living*,-but alledged he had a few weeks prior to the filing of the bill, sold the land to his son, Green, and that the person (Elijah Lynch) upon whom he had held a covenant for a conveyance of the legal title, had conveyed the title to Green *after the filing of the bill*.    Fourteen months (the record shows) after this an amended bill is filed, and Green is made a party; the bill was filed the 20th of April, subpœna executed on David Lawrence the 23d, and on the 30th Elijah Lynch conveyed the land to Green; neither Lynch nor Green were parties to the suit when the deed was made. Elijah Lynch had the legal title long before the commencement of the suit; he had the right of property and the right of possession derived from neither of the parties to the suit, nor acquired since the *lis pendens*,

Vol. II.                61

FENWICK'S AD'R.
*vs*
MACEY.

(exactly like the bank who held the title as mortgagee.) Yet this conveyance, it is declared, should not defeat the lien acquired by the suit; why? 4th, because "that the "conveyance was made to Green on the seventh day after "the service of the subpœna in this case on David, and "because the lien acquired by the *lis pendens* should not "be defeated by the legal title *acquired pendente lite,* un- "less Green Lawrence can prove satisfactoiily *a prior* "*equity* obtained fairly and upon a valuable considera- "tion, and in good faith acquired *before the filing* of the "*bill.*" Let me ask, had Lee Macey any previous con- tract or equity, or any pretensions to any right of any kind before that very day, (21st Feb. 1831,) when he purchased and took the possession from the defendants, *pendente lite.* Here is a case where you have applied (I wont say misapplied) the well established rule of *lis pendens,* and, I humbly conceive, to a case upon princi- ple the same. Now the law which you have asserted in this case is correct. If Green could have showed and proved a good equitable title, and had acquired that equitable title previous to the filing of the bill, he would clearly have shown a good right to hold on to the con- veyance made, *pendente lite,* because a court of *equity, in which he was,* would protect his prior equity fairly acquired, before the filing of the bill; but if that equity did not exist, or if a part or the whole of the purchase money was not paid when the bill was filed, and subpœ- na executed, the suit would have been a *lis pendens* on the unpaid part of the purchase money. This principle is more clearly laid down and explained by Chancellor Kent, in the case of *Heatley, &c.* vs *Finster & Muller,* 2 *John. Chy. Rep.* 158, there Winter, a trustee, who had power to sell, did, on the 17th May, 1809, *before the suit in Chancery was commenced,* sell 50 acres to Muller for $750, payable in seven annual instalments, with inter- est; the first became due 1st April, 1811; Muller took possession; the chancery suit was not commenced until June, 1809—see 1*st John. Chy. Rep. p.* 30, where the suit is commenced. Muller occupied the land until 1814, when he assigned his contract to Finster, who took the possession and improved the land. Finster, in Sep-

tember, 1813, filed his bill against Winter and obtained a decree for specific performance of the contract, directing and decreeing Winter to convey, on payment of the purchase money to Winter, who, in consideration of $1015, did convey, and all the money except a note for $118 had been paid but these payments, and the conveyance of the land all having been *made pendente lite*, were declared void as against the plaintiff. In the Chancery suit Chancellor Kent says: "when Finster took an as-"signment from Muller, $1015 were due and paid to "Winter in 1814, when the money was paid and a deed "executed. The question is whether the whole negotia-"tion (yes, Chancery suit and all) between the defendant "and Winter, and the payment of the money was not "*in judgment of law a fraud upon the rights of the* "*plaintiffs.*" He says Muller's contract *was good* in the first instance, but it was left inchoate; the money was not paid nor the deed made; his amicable suit added nothing to the validity of the defendant's claim, and when the party became chargeable with notice of the suit against Winter, he was bound to cease *all other dealing with him*. Yes, every act (suit and all) was declared a fraud in judgment of law. as against the plaintiff in the Chancery suit. The *lis pendens* was notice to all the world, and this man Finster, although he paid every dollar of the purchase money and took his deed, and that too in compliance with a previous *bona fide* contract before the bill was filed; yet having been paid, *pendente lite*, he was ordered and decreed to pay it over again or convey back the land in forty days. See how Senator Seward slips by this case; he declares he had not found a case nor had there been shown to the Court a solitary case in which the rule of *lis pendens* had been applied to the person who purchased by contract and enters into possession, and in part performs his contract *before suit commenced*, and then, *pendente lite*, without actual notice, fulfils his contract and takes a deed for the land. He cites a number of cases, some decided by Chancellor Kent, but he fails to cite this case, in the very same volume, and he asserts that in every case an entire contract and purchase was made *after the suit was commenced.*

Yes, even he who is laboring to get rid of this rule, so well established, even he admits the law well settled by all the cases, that where the entire purchase and contracts were *lis pendens,* however hard the fate of the purchaser may be, it is the well settled law of the land. Was the entire purchase and taking possession of Lee Macey *lis pendens?* Did he come *in pending the suit and purchase the equity of redemption from the defendants* themselves? Was it not Lee Macey who took the actual possession of Fenwick's slaves from the defendants in that very cause whilst it was going on with persevering diligence? Don't foist in the Bank as a defendant in this cause; don't call Lee Macey the Bank. He, Macey, is the man who came in *as intruder, as purchaser;* he did make his entire purchase pending the suit; he did purchase the equity of redemption from the defendants themselves; it was in them and no where else until he purchased; he did get the actual possession from them that very 21st day of February, 1831, and if you will but be candid and free yourself from your previous expressed opinions, both as to the fact and the law, you will, I hope and trust, feel a pleasure in rectifying the error into which you have inadvertently fallen.

I will now say a few words on the awful effects of the principle you have asserted as law in this case. It is this: that a third person may step forward and purchase and take from the defendants, *lis pendens,* the specific property sued for, and then set up title and resist the decree. If this is law there is an end to the recovery of specific property by suit, and this case is a melancholy instance. Here Lee Macey steps forward, purchases the property, takes the actual possession from the defendants in Fenwick's suit, and you say he can resist the decree and set up, and has a right to hold on to the property, because he says he has a derivative title—yes, because he says so, you say that gives him a right to litigate his title—how litigate? How is this derivative title made to appear? Do you call on him to prove it? O, no! you say he can take the property, and by barely setting up a derivative title, that is, barely asserting that he has derived title from A, B, or C, he can resist the decree and litigate his

title; but I ask, how litigate? Has he not taken the actual possession? He won't sue; he has all he wants— nothing can be done without Fenwick brings a new suit against him, in which he, Fenwick, has to prove his whole case over again before he can put Macey on the proof of his derivative title. Yes, Macey you say can take the possession from the defendants in Fenwick's suit and hold that possession; compel F. to sue him again, and he has to prove his whole case over again before Macey can be called upon or put to the proof of his derivative title; and if F. should prove his whole case over again and get a decree again; why, the negroes are gone again, somebody else will be sure to take them from Lee Macey, and turn round and tell Fenwick, now, sir, sue again, I have got another derivative title, go ahead again, I and Lee Macey have kept you at law long enough for the statute of limitation to bar your new suit. Yes, this is law now. There is nothing more clear and certain that if a third person can take the possession from the defendants, *lis pendens,* and compel the complainant to bring a new suit, the property sued for must inevitably be lost forever; if the rule, *pendente lite nihil innovatur,* don't apply to such a case it is a perfect mockery to bring a suit for specific property. Well might this Court say through the venerable pen of Judge Mills, that idle would be the grant of jurisdictions to Courts if the defendants could, by changing the possession of the thing sought, evade the justice of the Court. Yes, as that venerable pen said in the case of *Combs* vs *Castleman,* "pursuit would only mock the pursuer." Yes, in this very case that venerable pen makes another observation well worthy of his departed greatness. In 7 *Monroe, p.* 276, he uses the following words: "allowing to the defendants "or either of them, the benefit or shelter from this act "(this exception to the rule) or to protect themselves by "it as a shield in this action, is so repugnant to the moral "sense of all who are conversant with the history of the "transaction, that we should hesitate long before we "should permit it." I pray, I beg, I beseech you to hesitate long before you visit upon myself, my blood and kindred, this dreadful calamity. Is not your moral sense

FENWICK'S AD'R.
*vs*
MACEY.

of justice shocked to see a lawless and fraudulent intru-
der, with full notice and warning, who in this wanton
and aggravating manner, tears from those destitute or-
phans the last remnant of the wreck left them by their
deceased father, saved as it were, from the rapacity of
old Macey, only to be torn from them by his son. Hesi-
tate then, I beseech you hesitate—I have not had a fair
hearing by a full Court. Upon this case Judge Ewing
was not present at the argument; the points now sprung
upon me in the opinion were not taken or mentioned by
the counsel in opposition. I do believe before God, that
I have a just cause. The defendants are in the enjoy-
ment of the property; delay can do them no injury; fur-
ther investigation will have the effect of eliciting truth
and justice. I do therefore, beg and pray for a re-hear-
ing.

## RESPONSE,

*June 4.*

### By Chief Justice Robertson.

Whatever may have been the temper of the petition,
we have patiently and maturely considered the law, the
facts, and the arguments, which it so emphatically pre-
sents, and we are still clearly of the opinion that the de-
cision which the petition assails, is, in all respects, the
judgment of the law of the land on the facts exhibited
in the record.

The principle of *lis pendens* is this and this on-ly: "that a stranger, who, during the pendency of a suit for prop-erty acquired from either of the parties to that suit, the property thus in litigation be-tween them shall not be permit-ted to elude or controvert the decision therein against the title of the party from whom he obtain-ed the property.

The hard but necessary doctrine of *lis pendens* relied
on, and as we think, misapplied in the petition, is, as
we have understood it and yet understand it, this and
only this, in the whole extent of its principle and opera-
tion—that a stranger who, during the pendency of a suit
for property, acquires from either of the parties to that
suit, the property thus in litigation between them, shall
not be permitted to elude or controvert the ultimate de-
cision therein, against the title of the party from whom
he obtained the property. And the cases so copiously
and confidently cited and discussed in the petition prove,
when analyzed, nothing more nor less.

If then, as alledged, the Bank was a *bona fide* mort-
gagee of *A. Macey,* before the commencement of *Fen-*

*wick's* suit against him, the title of the Bank was not acquired *pendente lite;* and, of course, if *L. W. Macey* has acquired all the title of the Bank and no more, he occupies the place of the Bank, and can be no otherwise affected than it would have been by the decree between *A. Macey* and *Fenwick.*

Had the Bank simply foreclosed its mortgage, its title would certainly not have been concluded by the subsequent decree between *Macey* and *Fenwick,* merely because the decree of foreclosure was made during the pendency of their suit. A foreclosure of an equity of redemption operates only as a bar to the assertion of that pre-existing equity; it is only an adjudged waiver or abandonment by the mortgagor of an equity which he might have asserted, and makes irredeemable the title which was before redeemable. A decretal foreclosure can no more be considered as passing a new right from the mortgagor to the mortgagee than a foreclosure or bar of the mortgagor's right of redemption by a statute of limitations or by lapse of time should be deemed a transfer of it by the one to the other.

The fact, therefore, that the foreclosure was during the pendency of the suit between *Macey* and *Fenwick,* could not make the Bank a *pendente lite* purchaser any more than it was such a purchaser when it first acquired the redeemable title which ripened into an irredeemable one.

*L. W. Macey* acquired by purchase this matured and absolute title of the Bank; and he acquired no right from *A. Macey's* executors, because, having lost or abandoned the equity of redemption, they had nothing to pass to him by their voluntary act, or for which they could have been entitled to any consideration from him or the Bank. Nor did he even obtain *from them,* by contract or by any act or even consent of theirs, the possession of the slaves which were taken *in invitum* by the arm of the law for enforcing the right of the Bank, acquired before *Fenwick* ever sued *A. Macey.*

Whether the title of *Fenwick* or that of the Bank, as now held by *L. W. Macey,* is the best, is a question never yet litigated. The petitioning counsel wishes it concluded without litigation between the Bank or *L. W.*

A decretal order of foreclosure passes no new title to the mortgagee; it is only as a bar to the pre-existing equity of the mortgagor, and makes irredeemable the title which was before redeemable.

A purchase under a decree of foreclosure acquires no new right of the mortgagee; he acquires only the right of the mortgagee made absolute by the decree of foreclosure.

*Macey* and *Fenwick's* representatives. Why so? Only because *L. W. Macey* bought the title, not of *A. Macey* but of the Bank, whilst the suit between *Fenwick* and *A. Macey* was pending. It must be indisputable, that the title of the Bank was not concluded by the decree between *Fenwick* and *A. Macey.* And how then can the title of *L. W. Macey,* which is but the Bank's title, be concluded or affected by that decree?

If A, having title or claim to a slave, sell it to B, during the pendency of a suit for the same slave between C and D, both A and B being strangers to that suit, can B's purchase or title be concluded by the decision of the question of title in that suit as between the parties thereto? Was B, in the technical sense, a *pendente lite* purchaser? Such a question is not debatable. B's title being unaffected by the suit to which he was a stranger, would the fact that, after he purchased from A, he had, by *distringas* or other process of law for enforcing his right, taken the slave from one of the parties to the suit, during its pendency, have subjected his title to the decision in that suit? This, as we think, is as plain a question as the other. And no case cited in the petition will be found, when scrutinized and rightly understood, to have settled or intimated any thing to the contrary. It cannot be either reason or law that, if a *bona fide* claimant of a movable thing, take it by legal process or even by the natural remedy, from another in the possession of it, his title shall be concluded without trial or question, merely because, when he thus took the possession in his own independent and pre-existent right, a suit was pending, and perhaps without even his knowledge, between strangers for the purpose of determining *their* conflicting claims to the same property. Unless he had, by contract, express or implied, acquired some title *to,* or interest in the property from the party to the suit, he could not be concluded by the judgment or decree afterwards rendered in it; and no adjudged case or even judicial dictum to the contrary, has been cited in the petition or can, as we believe, be found in the annals of English jurisprudence.

It still seem to us, therefore, that the original title of the Bank and the derivative title of *L. W. Macey* has not been concluded by the decree between *Fenwick* and *A. Macey*, and remains yet to be litigated.

If, as asserted in the petition, *Fenwick's* title is superior to that of the Bank or *L. W. Macey*, the way for establishing that fact was open and plain. Had that way been taken and pursued, then perhaps the indignant and persevering counsel might have found that *his* failure hitherto, in another way, ought not to be attributed either to "*the party* or *the Court*," but to the law upon the case as prosecuted and now actually presented.

The petition is overruled.